THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
CHARLES DANIELS, Appellant.

Second Department, August 16, 1982

APPEARANCES OF COUNSEL

*William E. Hellerstein* (*Alan S. Axelrod* of counsel), for
appellant.

*John J. Santucci, District Attorney* (*Aley Z. Alexander* of
counsel), for respondent.

OPINION OF THE COURT

O'CONNOR, J.

Maurice Simms, 10 years old, had just finished his lunch,
his mother had left the room to go visiting and he was all
alone in their fifth floor apartment watching television. He
heard a scream and, as he looked out the living room
window onto the third floor roof of the adjacent building,
some 50 to 100 feet away, he saw a man wearing blue Lee
pants and a plaid shirt, dragging a little baby across the
roof. As he watched, they disappeared for a few minutes
behind an incinerator but soon reappeared and as he
looked on the man pushed the now naked infant off the roof
and then ran back into the building.

Within five or six minutes, according to his testimony, Maurice saw Housing Authority Police Officers Mackey and Moss, whom he knew, arrive at the scene on the third floor roof and, at his call, they came over to the Simms' apartment and questioned the boy. In substance Simms described the tragic events he had just witnessed and offered a description of the perpetrator that he repeated the following day to New York City Police Detective Reilly of the Queens Sex Crime Squad: male, black, medium Afro, black hair, medium skin tone, 5 foot 5 inches tall, wearing a blue striped shirt, dungarees and black sneakers, 24 years of age. That description would fit innumerable young black males, but is at substantial variance with the actual physical appearance of the defendant, who at the time, was 35 years old and who then wore a large "wild" Afro hair style "[l]ike sticking all up" in a very unruly and messy fashion.

In the days that followed, Maurice was interviewed at both the local police precinct where he viewed police photographs on a machine and at another location in the county. He did not, however, recant the description he had given, but instead said that he did not know the perpetrator's name, and, in fact, told Detective Reilly twice that he had never seen the perpetrator before.

On September 27, seven days after the crime, young Simms was interviewed at his grandmother's house in Far Rockaway. Present were Detectives Miele and Reilly of the New York City Police, and Detective Washington of the Housing Authority Police. There, for the first time and in response to a suggestive question posed by Miele, "Was it Charles?", Simms answered in the affirmative and said he knew Charles' last name — Daniels. The arrest, indictment, trial and conviction of defendant followed.

Maurice Simms, the People's sole identifying witness, for the previous three years a student assigned to a class for emotionally handicapped children, lived with his mother in a housing authority project in Queens County.

Charles Daniels, defendant, resided in an apartment in the same building and on the same floor across the hall from young Simms. The two had been casual neighbors for

about three years and young Simms was "fully familiar" with and saw Daniels "every day". Daniels never in any manner threatened Simms nor did he ever strike him or hit him.

Upon the trial young Simms testified that at first he gave the police what he called a "phony description" of the perpetrator because he was scared that he too might be thrown off the roof. He further testified that at the time he accused defendant of the crime, he, Simms, was at his grandmother's house and "I wasn't really that much scared and I didn't want it to happen to no one else." There was no doubt in his mind at trial that the defendant was the man who threw the baby off the roof and the boy was the only incriminating witness presented by the prosecution.

Charles Daniels, 35 years of age, took the stand in his own defense and testified that he was gainfully employed; that he had never been arrested for or convicted of a crime; and that he was single and lived with his mother in the same building and on the same floor as young Maurice Simms, whom he had casually known since the boy moved into the building some three years before the trial.

The defendant denied categorically and unequivocally that he assaulted any child at the time and place charged or at any other time. His testimony traced, in some detail, his activities shortly before and at and about the time on September 20, 1978 when he allegedly committed the crimes charged against him. In substance, he stated that the day in question was a Wednesday, his day off from work. On that morning he returned home from a neighborhood laundromat between 11:45 and 12:00 o'clock noon. He talked to his mother, who was preparing their lunch, and about 12:30 P.M. he took his radio and went outside where he sat on a bench directly in front of his apartment building. In response to his mother's call about 12:35 he went back upstairs, took 10 to 12 or 15 minutes to eat a sandwich, again took his radio and went directly downstairs to resume his position on the bench.

It was defendant's testimony that when he first arrived at the bench before lunch he noticed that a Mrs. Jones and Mrs. Butler were seated there. After a while one Bennie

Hill "came out and sat beside me." He testified that after lunch he rejoined Mrs. Jones and Mrs. Butler at the bench and that they were joined in turn by one Wilbert Diselle.

Defendant's witnesses corroborated his chronology.

Mrs. Frances Daniels, defendant's mother, testified that at about 12:25 to 12:30 she saw her son sitting on a bench in front of the apartment house with Bennie Hill. From the window she beckoned to him to come in for lunch. She said that she had not asked witnesses to testify for her son but that, as a matter of fact, "[p]eople told me that they were on the bench with him."

Bennie Hill, a salesman and formerly a clinical laboratory technologist with no criminal convictions, said that at about 12:15 P.M. he looked out his window from his first floor apartment in the same building and saw defendant sitting on the bench with his large radio. Hill got dressed and joined defendant at about 12:20 or 12:30 P.M. He testified that people were "coming and going", but he specifically said that defendant, Gladys Butler and Sadie Jones were sitting there. He said that he and defendant sat on the bench until the police arrived at 1:30 or 2:00 P.M. He recalled the date — September 20, 1978 — because "the area [was] flooded with police and detectives". After defendant was arrested, he, Hill, went to Mrs. Daniels and volunteered to testify.

Wilbert Diselle testified that he had never been convicted of a crime. He said that he saw defendant, Bennie Hill, Mrs. Butler and Mrs. Jones sitting on the bench in front of the building at 1:00 P.M., at which time he joined them. About 10 minutes later, according to his testimony, "the police cars [came] swarming around." It was Diselle's testimony that he and defendant remained on the bench discussing baseball and a recent prize fight from 1:00 P.M. until about 2:45 P.M. and that the women were seated at the other end of the bench. The ladies carried on their own conversation. Diselle said that he and defendant lived in the same building but were not really more than acquaintances in that they had never visited each other or gone out together. He said that shortly after defendant's arrest he, Diselle, went to defendant's mother and volunteered to testify in his behalf.

Gladys Butler (not related to Carolyn Butler, the victim's mother), who had no prior arrests, likewise corroborated the presence of defendant, Mrs. Jones and Bennie Hill on the bench outside of the building at or about 12:15 P.M. She recalled the time because she was feeding her granddaughter and looked at the time. She said that she and the defendant were not friends but she knew who he was. She specified that defendant came out to the bench some minutes after she did.

The People's sole rebuttal witness, Evette Chase, testified that she lived in the same building as defendant, had known him for three years and that on September 20, 1978 she left home at around 12:30 P.M. in order to attend her class at Bronx Community College. She said that when she left the apartment and went downstairs, she did not see defendant outside, but conceded that she was not looking for him and did not have him in mind when she left for school that day.

Defendant's motion to dismiss was denied and, following summations and charge and after deliberating some three hours and 40 minutes, the jury returned a verdict finding defendant guilty of both attempted murder in the second degree and sodomy in the first degree.

Prior to sentence defendant moved to set aside the verdict on the grounds of newly discovered evidence. Following a hearing, Criminal Term denied the motion upon the grounds that the proffered evidence was neither newly discovered nor would it have been admissible if offered upon the trial.

For reasons hereinafter set forth, the judgment must be reversed.

Prior to the court's charge, counsel specifically requested an alibi charge and an identification charge. Upon appeal, it is defendant's prime contention that the charge on both issues was so seriously flawed as to mandate reversal.

Before analyzing the charge, let us first properly set the stage for that discussion. As indicated, four witnesses, including defendant's mother, testified at length for the defense. All stated, categorically, that defendant was with them at and about and around the time that the crime took

place. To read the record of their testimony is to be impressed. For example: of the three (excluding the mother), none of the witnesses had any criminal record; all volunteered to testify shortly after learning of defendant's arrest; all gave credible reasons for recalling the particular events of the day of the crime; both male witnesses were gainfully and legitimately employed; cross-examination by the prosecution was totally unproductive and the chronology related by the witnesses remained unshaken.

The thrust of their testimony was that defendant was continuously in the sight and presence of at least one, probably two or possibly three of the witnesses (four if the mother be included) from about 12:15 to 2:45 P.M., except for the brief time (10 to 12 or 15 minutes) that defendant was upstairs having lunch.

In the face of such seemingly persuasive testimony, as opposed to the somewhat questionable identification by the People's sole incriminating witness, the question is, how did the jury return a verdict of guilty?

Several rational explanations are suggested: First, the jury may have rejected the alibi testimony. Even though it may be difficult to accept such a conclusion upon the record of uncontradicted testimony in this case, the jury was well within its rights in rejecting such testimony. Resolution of the witnesses' credibility, however, is not before us on this appeal.

Second, the jury may have noticed that none of the witnesses made *any* reference to the admitted fact that defendant was out of their presence and sight during the 10-12-15 minute lunch break and concluded that perhaps the crime took place then.

Third, the jury may have somehow determined that the crime took place *prior* to 12:15 P.M. — the time the witnesses first saw defendant sitting on the bench. Obviously *if* by any fair interpretation of the testimony and the reasonable inferences to be drawn therefrom, the jury could have made *either* of these determinations then, obviously, the jury had to conclude that no valid alibi had been presented.

Although a matter of crucial importance to a resolution of this emotion-laden, one-witness, pure identification case

containing a plausible alibi defense, neither the prosecution nor the defense ever fixed the precise time — let alone the approximate time — of the crime. Let us devote a few minutes to searching the record in an effort to fill that void.

Carolyn Butler testified that she reported her two-year-old son missing to the police by calling 911 and that a radio patrol car responded to her home in the housing project. She entered the police car and a search began for the missing child. Soon thereafter her badly bruised and battered baby was found in the midst of a group of people in front of one of the project buildings. One of the police officers — later ascertained to be Tummes — took the boy and turned him over to her.

Police Officer Tummes testified from his police memo book that he had received a radio run of a missing child and that he and his partner responded to the call at about 1:30 P.M. and picked up the child's mother at her home. His testimony was that within five to seven minutes the child was found in front of one of the buildings and that Tummes took the child from someone (later ascertained to be Plaza) and returned him to the mother.

Plaza, a Housing Authority groundskeeper, testified that he had finished lunch and was cutting grass in the area when an unknown little boy on a bike "told me someone was *thrown* off the roof, and took me to where the kid was. We found him on the lawn" (emphasis supplied). Plaza covered the naked child with his sweatshirt, took him to the front of the building and there gave him over to the police. Plaza fixed the time at about 1:00 P.M.

Although what the "little boy on a bike" had seen was not in evidence itself, Plaza said that the boy had reiterated: "that he [the baby] was *thrown* off the roof" (emphasis supplied). Are these words susceptible of any other meaning than that "the little boy on a bike" had seen the frightful spectacle of the baby's body actually being thrown from the roof of the building? Is there any other inference to be reasonably drawn but that the crime was committed at that precise moment? As a matter of fact, Detective Miele responded to a question by the prosecutor by saying: "A. Yes sir. Mr. Plaza was a maintenance man who found

the boy on the ground. He informed Police Officer Sunny that an unknown youth on a bicycle approached him and said some kid *just* thrown off the roof" [*sic*] (emphasis supplied). Detective Miele, a 12-year veteran attached to the Queens Sex Crime Squad, and in charge of the investigation, had fixed the time of the crime in his reports as "approximately" 1:30 P.M. The prosecuting attorney in his summation said that "the child apparently hit the ground around 1:30" P.M.

All this hearsay was consistent with the testimony of young Simms who, although he did not fix the time of the crime, had testified that Officers Mackey and Moss arrived on the scene within "a couple of minutes" and then put it at "around five or six minutes" after the baby was thrown off the roof!

In determining the strength of the People's case it is thus a clear and reasonable inference that the crime took place sometime between 1:30 P.M. and 1:45 P.M. on that hot, sunny September afternoon, at precisely the time defendant was seated on a bench with his alibi witnesses. It is, of course, blackletter law that the significance and the weight of identification and alibi testimony is for determination by the triers of the facts. I have summarized in some detail the alibi testimony and the People's sole incriminating identification testimony in order to emphasize that this was a pure identification case contradicted squarely by alibi testimony. Because of its persuasive power and inherent unreliability, eyewitness identification is always fraught with peril but when, as here, it is suspect, it is frightening indeed. Under such circumstances the prosecution's case rests upon a most slender and shaky reed — a situation demanding the utmost caution and one in which so called "harmless errors" are anathema.

Young Maurice Simms, the People's sole identifying witness, apparently an emotionally handicapped 10 year old, told a somewhat confusing, ofttimes contradictory and frequently conflicting story. He lied to the police about his prior knowledge of the attacker because he was frightened, yet seven days later at his grandmother's house where he no longer felt scared he still did not come forward with

defendant's name until he was asked the leading question, "Was it Charles?"

It must be noted that when young Simms was questioned as to how he identified the defendant, his answers leave much to be desired. On direct the boy testified to seeing defendant as he pulled the little baby *toward* the incinerator, but on cross he said that he did *not* recognize Charles until Charles came from *behind* the incinerator "half walking, running, that's when I saw him" and when he recognized that it was the defendant. Elsewhere he admitted that he saw the defendant's face for "only a second or short period of time" [*sic*] but the extremely delicate identification process was further thrown off balance by young Simms' statement on cross, "I just staring at it [defendant's full face] and then I knew it was Charles. I had an idea. I knew it was his face *because the way he wears his hair*" [*sic*] (emphasis supplied).

Against this background we proceed to an evaluation of the court's instruction on identification and alibi.

A reading of the court's charge on identification makes it clear that it was fundamentally flawed. The court charged: "The ultimate question of the *truthfulness* of the witnesses' testimony is for you to decide" (emphasis supplied). A reading of the record, however, makes it clear that the issue was *not* whether young Simms was telling the *truth,* but whether or not he was *mistaken.* This is the situation found in many, if not most, pure identification cases. The eyewitnesses are usually firmly convinced that they *are* telling the truth and neither cross-examination nor endless polygraph tests will ever shake that belief. Bitter experience tells us, however, that the real issue is whether or not the witness is mistaken — however honest or truthful that mistake might be. Although defense counsel's request for an appropriate identification charge was couched in language that was woefully inadequate and grossly insufficient, the court, confronted by these truly extraordinary circumstances, and given the contradictory nature of the eyewitness testimony, should have charged that in weighing the evidence on the issue of identification, the jury should focus on accuracy as well as veracity, weighing all the facts and circumstances surrounding the

giving of two different descriptions, one of a stranger, the other of this defendant (see *People v Rothaar,* 75 AD2d 652).

Efforts to control or, at least, to somehow reduce the built-in potential for error in eyewitness cases have long been the concern of the best minds of both Bench and Bar. Indeed, Part 10, Criminal Jury Instructions, covering identification issues, is now in the process of publication and will soon be widely distributed throughout the State of New York. Predicated upon long, intensive, empirical study by the Criminal Jury Instructions Committee (New York), the publication takes, as its prelude, the worrisome words of warning of the United States Supreme Court in *United States v Wade* (388 US 218, 229): " '[Mistaken identification] probably accounts for more miscarriages of justice than any other single factor — perhaps it is responsible for more such errors than all other factors combined.' " To overcome this constantly recurring danger, the committee proposes truly commendable pattern jury charges which, in my opinion, warrant the thoughtful consideration and support of all of us who seek justice in this vexing, vulnerable and truly troubled area of the criminal law.[*]

---

[*] CJI 10.01 Part A [*No other evidence connecting defendant with commission of offense except eyewitness identification testimony*]:

"In this case, as you are now aware, the only evidence which in any way establishes or tends to establish that the defendant, _____, is the actual perpetrator, *i.e.,* the 'right
<br>name
man,' is the testimony of the eyewitness, _____. Apart from his testimony that
<br>name of witness
the defendant is the 'right man,' there is no other evidence whatsoever which identifies the defendant as the perpetrator. In such case, the law requires that the jury be satisfied that identification testimony by _____ is as certain as human recollection
<br>name of witness
permits under the most favorable circumstances.

"It becomes your duty to examine with great care all the circumstances surrounding the crime. For example, what were the lighting conditions at the scene of the crime? What was the distance between _____ and the perpetrator? Did _____ have
<br>name of witness name of witness
an unobstructed view of the perpetrator? Did _____ have an opportunity,
<br>name of witness
during the commission of the crime, to observe and remember the facial features, the body size, the hair, skin color and the clothing of the perpetrator? How much time elapsed during the commission of the crime? During that period of time, how long did the witness actually observe the perpetrator? Did the perpetrator have distinctive features which an eyewitness would be likely to remember and recall? What was the mental and emotional state of the witness? These are some of the factors you must weigh in deciding whether the witness in fact had an opportunity to observe and, therefore, to remember, the perpetrator.

Moreover the facts here surrounding the identification of the perpetrator were so unusual, complex and confusing as to require careful and prudent judicial guidance which, regretably, was not given (see *People v Gardner*, 59 AD2d 913). On the contrary, the trial court gave a thin, sparse and inadequate charge on identification and that error was grievously compounded when the court highlighted the defense of alibi by charging: "I instruct you and charge you that an alibi, if you believe it, is a strong defense since, obviously, a person cannot be in two different places at the same time. Therefore, *I direct you to examine, scrutinize and weigh carefully the testimony of the alibi witnesses*" (emphasis supplied).

In *People v Lediard* (80 AD2d 237, 241), the First Department ruled: "The court erroneously singled out the issue of alibi and instructed the jury that they were to 'most carefully scrutinize' the evidence relating thereto. This instruction did more than merely highlight an aspect of the trial. It placed an unfair burden on this particular theory to the exclusion of all other theories presented."

This court, in *People v Fludd* (68 AD2d 409, 411), described the problem this way: "Errors were also committed by the trial court in its charge regarding defendant's alibi. First, the trial court stated: 'Evidence with relation to an

"You must also evaluate the credibility of ⸻⸻⸻ as you observed him while he
                                              name of witness
testified in court. You must evaluate his general intelligence, his capacity for observation, reasoning and memory, and determine whether you are satisfied that he is a reliable eyewitness who had the ability to observe, and the capacity to remember, the facial features, body, clothing and other characteristics of the perpetrator.

"From your evaluation of the witness' opportunity during the commission of the crime to observe and remember the perpetrator's facial features, body features and clothing, and upon your assessment of his ability to observe, to reason and to remember, you will determine whether you are satisfied beyond a reasonable doubt that the defendant is the 'right man,' *i.e.*, the man who in fact committed the crime. If you have a reasonable doubt whether the defendant is the one who committed the crime, you must find him not guilty.

"You will understand that all of us, judge, prosecutor, defendant, and you the jury, must be deeply concerned that no mistake in identification should result in the conviction and punishment of the 'wrong man,' of a defendant innocent of the crime * * *

"In evaluating the witness' capacity to observe and remember, you may consider the 'description' of the perpetrator which he gave to the police soon after the commission of the crime. If that 'description' does not match the physical characteristics of the defendant, that factor must be considered by you in making your determination of the witness' capacity and ability to observe and remember the physical features of the perpetrator. On the other hand, an accurate matching 'description' may be considered by you in assessing the witness' capacity to observe and remember."

alibi must be more carefully scrutinized.' While such charge is not improper per se, the trial court should also have given a like charge with respect to identification testimony so that balance would be properly preserved (see *People v Annis,* 48 AD2d 622, 623)." Further on, the court stated (p 411): "A Trial Judge's instructions which are inadequate or not clear, or which tend to mislead, are well-recognized grounds for reversal. (*Sears v Birbeck,* 321 Pa 375.) Under New York law, a defendant has *no* burden of proving an alibi to any degree, and an instruction in that regard must be clearly and explicitly given to a jury when alibi evidence has been presented (see *People v Rabinowitz,* 290 NY 386; *People v Johnson,* 37 AD2d 733)."

In the case at bar not only was there no direction to subject the identification test to the same searching scrutiny used for the alibi, but also the court neglected to charge that the prosecution must disprove the alibi defense beyond a reasonable doubt (see Penal Law, § 25.00, subd 1; *People v Cuvilje,* 66 AD2d 761, 762).

Although neither objection nor exception was taken to the court's charge and these errors are therefore not preserved for appellate review as a matter of law, the interest of justice strongly suggests our intervention and reversal as a matter of discretion. The errors here committed can hardly be held to be harmless (see *People v Crimmins,* 36 NY2d 230).

Therefore, the judgment must be reversed and a new trial ordered.

DAMIANI, J. P., GIBBONS and BOYERS, JJ., concur.

Judgment of the Supreme Court, Queens County, rendered December 11, 1979, reversed, as a matter of discretion in the interest of justice, and new trial ordered.