OPINION OF THE COURT
Herbert A. Posner, J.
Unlike Lady Macbeth in her unsuccessful effort to wash away the blood stains of guilt,[1] defendant McCann seeks out the perpetrator’s blood stains, found by the police at the crime scene and on the victim’s pants.
In a pretrial motion to dismiss the indictment,[2] the defendant contends that test results of this evidence would exculpate him. In so doing, the defendant has raised novel issues concerning the duty of the police to preserve potentially exculpatory evidence and whether the People should be sanctioned for their failure to produce such evidence. The People, in response, argue that there is no duty to preserve evidence which might exculpate a suspect when there is no defendant or suspect at the time and that, in *1026 any event, the People should not be sanctioned for failure to produce evidence when they do not intend to offer it or related evidence at trial.
The court is of the opinion that the failure of an investigative agency to preserve potentially exculpatory evidence, when it should have been reasonably foreseen that such evidence was material on the issue of guilt, violates the defendant’s due process rights regardless of whether he was a suspect at the time.
The defendant, Francis X. McCann, was indicted on January 24,1980 and charged with the crimes of sodomy in the first degree, robbery in the first degree, sexual abuse in the first degree and two counts of criminal possession of a weapon in the fourth degree. These crimes were committed on June 13,1976, but the defendant was not arrested until more than three years later.[3]
The defendant was tried for the crimes charged in this indictment (No. 128/80) in September, 1980. A mistrial resulted because of a deadlocked jury which was reported to have said that its final vote was 10 to 2 for acquittal. The People’s case consisted essentially of a one-witness identification by the victim of the crime. A corporeal identification of the defendant was first made by the witness on December 17, 1979, more than three and a half years after the crime was committed, following a photo identification on November 27, 1979.
In preparing for a retrial, counsel for the defendant, who was newly retained after the first trial, requested the prosecution to produce certain evidence. This request was based upon the official police report prepared and signed by Detective Stanley E. Carpenter of the Queens Sex Crimes Unit on June 13, 1976. According to this report, the complainant struggled with her assailant and, in the course of the struggle, the assailant cut his hand with his own knife. The police report then states: “A further search of the area revealed possible blood stains on the steps and wall leading to the roof door. Stains were small but a possible sample *1027 was removed and will be sent to the police lab for processing. Complainant’s pants also had a small blood type stain on them and will be vouchered.”
Based on the statements in the police report, the attorney for the defendant requested a copy of the police laboratory report pertaining to the blood scrapings and production of the bloodstained trousers for analysis. Some months thereafter, the District Attorney’s office notified defense counsel that it could not locate either the blood samples, trousers or a laboratory analysis report. The defense then moved to dismiss the indictment on the ground that the failure to preserve this evidence violated the defendant’s constitutional rights to due process, as enunciated in Brady v Maryland (373 US 83).
On July 2, 1982, a hearing on the motion was conducted by this court, at which the People were directed to explain the failure to preserve the blood scrapings and the bloodstained pants and the defendant was to produce expert testimony as to the value of this evidence if it had been preserved. At this hearing, Dr. Robert Charles Shaler, Director of Serology for the Office of the Chief Medical Examiner for the City of New York, testified on behalf of the defendant. The People called Detective Stanley Carpenter who prepared the police report and Detectives Michael Fahy and James V. White, both of the Queens District Attorney’s office.
As a result of the evidence adduced at the hearing, this court made the following findings of fact. Detective Carpenter believed that the blood stains found on the steps, wall and complainant’s pants belonged to the perpetrator and was aware that it had forensic value for he knew that results of blood tests could be used to either identify or exclude possible suspects. Nevertheless, he intentionally discarded the blood scrapings he collected after “someone” told him they were insufficient to send for analysis, although this person was not a serology expert. The officer also did not recall that he ever vouchered the complainant’s slacks, as he had intended. He had permitted her to wear them home instead of giving her substitute clothing; but he made no effort to retrieve them at a subsequent *1028 time.[4] Detectives Fahy and White, who were assigned by the District Attorney’s office to locate the slacks after the defense request, failed to do so following some rather cursory efforts.
From the testimony of Dr. Shaler, whom the People admitted was a serology expert, the court learned that human blood is comprised of several groups of characteristics, including certain genetic factors which can be used to distinguish blood samples. One of these is blood type, known as the ABO genetic marker system. There are also many other systems which can be used, until a unique genetic profile of a blood sample is arrived at, which distinguishes it from any other. Such exclusion can be made, not only with reasonable certainty, but with absolute certainty. Moreover, simply using two systems, the ABO and GM systems, it is possible to distinguish one blood sample from another in 85 to 90% of the cases. The age of the sample does not preclude such analysis for, if it is properly preserved, it can be tested after many years and the methods of preservation are simple. In fact, blood permitted to dry at room temperature, as on the complainant’s slacks, needed no special preservation in order to be tested, even six years later.
The rule of Brady v Maryland (supra, p 87) is “that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.” In United States v Agurs (427 US 97), this duty to disclose material evidence was said to also exist when there is a general request or even no request. (Also see People v Kitt, 86 AD2d 465.) This rule has been interpreted to place upon the government a correlative duty to preserve such material evidence. (See, e.g., Government of Virgin Islands v Testamark, 570 F2d 1162; United States v Bryant, 439 F2d 642; Davis v Pitchess, 388 F Supp 105; People v Saddy, 84 AD2d 175; People v Richter, 102 Misc 2d 285; People v Nation, 26 Cal 3d 169; People v Hitch, 12 Cal 3d 641; State v Havas, 95 Nev 706; State v Wright, 87 Wn 2d 783.) In at *1029 least two of these cases law enforcement agencies have been directed to take measures to ensure the adequate preservation of such evidence in the future. (United States v Bryant, supra; People v Hitch, supra.)
In this case, the police unaccountably failed to preserve for testing samples of the blood of the perpetrator of the crimes charged in this indictment, whom the police believed had also perpetrated a number of other sex offenses. The results of scientific analysis are admissible at trial if they establish a fact, including identity, with reasonable certainty. (People v Allweiss, 48 NY2d 40, 49-50.)[5]
The court finds that the police acted in an irresponsible and negligent manner in discarding the blood scrapings taken from the scene of the crime without any attempt at testing them and in allowing the victim to wear her bloodstained slacks home and then forgetting to voucher them. The court further finds that this evidence was material on the issue of guilt for, according to Dr. Shaler, these blood samples could have been tested and the results utilized to completely exonerate the defendant or to inculpate him.
In this State, the results of blood tests have already been recognized as both exculpatory (Family Ct Act, § 532), and inculpatory evidence (Matter of Abe A., 56 NY2d 288). In fact, the Court of Appeals ruled in Matter of Abe A. that, under certain circumstances, a court order may issue to obtain a blood sample of a suspect for matching with the blood of the perpetrator found at the scene of a homicide. In so doing, the court (p 299) acknowledged that: “The scientific validity and reliability of tests used to identify the type of blood a particular individual carries and to determine whether the blood of one person matches that of another are well recognized in both the medical and legal communities”. It follows, almost as a necessary corollary, that the police should also be required to preserve blood samples of the perpetrator found at the scene of a crime.
After determining the significance that the unpreserved evidence bears on the question of guilt, the next question is *1030 whether the prosecution should be sanctioned for the failure of the police to preserve such material evidence. This issue confronted the District of Columbia Circuit Court in United States v Bryant (439 F2d 642, supra) with reference to tapes of conversations between the defendants in a narcotics prosecution and an undercover agent, allegedly concerning the sale of narcotics. As with the blood scrapings and bloodstained slacks in this case, no attempt was made to preserve these tapes which were unaccountably “lost”. The court (p 644) observed that: “These cases point up an anomaly of our criminal process: controlled by rules of law protecting adversary rights and procedures at some stages, the process at other stages is thoroughly unstructured. Beside the carefully safeguarded fairness of the courtroom is a dark no-man’s-land of unreviewed bureaucratic and discretionary decision making. Too often, what the process purports to secure in its formal stages can be subverted or diluted in its more informal stage.” After stating (p 644) that in the future, all “rigorous procedures to govern preservation of such evidence by federal investigative agencies, including the District of Columbia police”, would be required, the court (p 653) concluded that a new trial of the case would be pointless since, without the testimony of the undercover agent, there would be no case and, therefore, the choice was either dismissal of the indictment or affirmance. The case was then remanded for a hearing by the District Court to determine which of these would serve the ends of justice with instructions (p 653) to weigh “the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial”.[6]
More recently, the New York Appellate Division, Second Department, was confronted with the same dilemma and arrived at the same conclusion. (People v Saddy, 84 AD2d 175, supra.) The police, for reasons of economy, had erased tapes of a conversation between the defendant and an undercover investigator, which were relevant to a viable *1031 agency defense presented by the defendant at his trial on drug charges. The Appellate Division (p 178) agreed that: “Under Brady v Maryland (supra) the prosecution is required to disclose, in advance of trial, evidence which is favorable to the accused. In order to safeguard the defendant’s rights under Brady, the prosecution, as well as law enforcement officials, are under a duty to diligently preserve all materials which may be subject to disclosure (United States v Bryant, 439 F2d 642). It is not for the prosecution, or the police, to select which materials should be preserved, and which should be destroyed. Were law enforcement officials empowered to pick and choose the materials deemed worthy of preservation, then the due process rights guaranteed by Brady would be shallow indeed; Brady could be circumvented by merely destroying evidence unfavorable to the prosecution before it is demanded by the defendant (see United States v Bryant, supra, p 648).” Following the Bryant rule, the court held (p 179) that whether the prosecution would be sanctioned turned on “ ‘the degree of negligence or bad faith [on the part of law enforcement officials], the importance of the evidence lost, and the evidence of guilt adduced at trial’ ”. The appellate court concluded (p 180) that, although the police did not act in bad faith, based on the trial record, “the prosecution should be sanctioned for the erasure of the tapes, and that the only appropriate disposition is reversal of the two sale convictions.”
The People’s contention that there was no duty to preserve the evidence in this case because the police did not have a suspect at the time it was discovered, is interesting but untenable. The duty of the police and other investigative agencies to preserve evidence cannot depend upon the existence of a suspect any more than disclosure can be “circumvented by merely destroying evidence unfavorable to the prosecution before it is demanded by the defendant.” (People v Saddy, supra, p 178; accord People v Nation, supra, p 175, n 1.) Of course, the prosecution is not required to make a complete and detailed accounting to the defendant of all police investigatory work on a case. (Moore v Illinois, 408 US 786, 795.) But, here the police recognized the importance of the evidence and undertook to preserve *1032 it. Then, with apparent indifference to the rights of anyone who might be accused of the crimes, they abandoned their efforts and the evidence. As a result, the defendant, whose ability to establish an alibi defense was vastly hampered by the passage of over three years between the time the crimes were committed and his arrest, was deprived of evidence which could have exculpated him, not just with reasonable, but with absolute certainty.
Where there is no other evidence connecting a defendant with the commission of a crime, except eyewitness identification testimony, the Bench and Bar have always been concerned that the “wrong man” not be mistakenly accused and convicted of a crime he did not commit. This “worrisome” problem has been discussed recently in an erudite decision by Associate Justice O’Connor of the Appellate Division, Second Department.[7] Quoting from United States v Wade (388 US 218, 229), Justice O’Connor makes the point that: “ ‘[Mistaken identification] probably accounts for more miscarriages of justice than any other single factor — perhaps it is responsible for more such errors than all other factors combined.’ ” (People v Daniels, 88 AD2d 392, 401.)
Under the circumstances, the court finds that the prosecution should be sanctioned for the failure of the police to preserve evidence which was not merely material, but invaluable, on the issue of guilt (or as in this case lack of guilt). The court further finds that the one and only appropriate sanction is dismissal of this indictment. Accordingly, the defendant’s motion to dismiss the indictment is granted.

. “Out damned spot! Out I say!” (Macbeth, act 5, scene 1).

. This is probably the first reported case of this nature in which a pretrial Brady motion is granted. All of the cases cited in this decision deal with posttrial motions. What makes this case unique is the fact that there was a prior trial with a hung jury.

. The charges in this indictment are part of a larger series of sex offenses, sharing a similar modus operandi, which were under investigation by the Queens Sex Crimes Unit of the New York City Police Department for a number of years before the defendant was arrested and charged with the commission of several of the offenses.

. The usual police procedure is to either offer the victim substitute clothing, or to instruct the victim to preserve the evidence until retrieved by the police.

. They are also discoverable prior to trial in this State, both by the defendant (CPL 240.20, subd 1, par [c]) and the prosecutor (CPL 240.30, subd 1) and failure to comply with a demand for such discovery is subject to sanctions, including any deemed appropriate by the court (CPL 240.70, subd 1).

. In this case, the answers to this three-pronged test would be (1) degree of negligence — great; (2) importance of evidence lost— very important; and (3) evidence of guilt adduced at prior trial — not very strong (since there was a hung jury 10 to 2 for acquittal).

. People v Daniels, 88 AD2d 392.