THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ISA BRNJA, Appellant.

Second Department, August 13, 1979

18

APPEARANCES OF COUNSEL

*Richard G. Fontana* for appellant.

*Carl A. Vergari, District Attorney (Carl J. Rubino, Jr.,* and *Gerald D. Reilly* of counsel), for respondent.

### OPINION OF THE COURT

TITONE, J.

After a jury trial, the defendant was convicted of robbery in the first degree and criminal possession of a weapon in the third degree.

The principal question on appeal is whether, under the circumstances, the action of police officers (1) in ordering defendant and his alleged accomplice to leave the van in which they were traveling, (2) placing them in custody and handcuffing them, and (3) transporting them to the scene of the robbery for identification, tainted both the ensuing pretrial identification of defendant and the search of the van.

■ The judgment should be affirmed. In my opinion the record fully supports a finding that exigent circumstances existed to justify the alert and efficient police action which

produced a reliable, prompt and almost instantaneous showup identification.

At the combined *Wade-Huntley* suppression hearing the following pertinent testimony was adduced:

Frank Mutalipassi, a clerk at Sharpstein's Liquor Store located at 315 Saw Mill River Road in Yonkers, testified that on November 11, 1976, at about 8 P.M., a man came into the store and asked for a pint of Russian vodka. Mutalipassi told him that the smallest quantity carried by the store consisted of "fifths". The man, who spoke with a slight accent (Slavic, Russian or Polish) was in the store about two minutes before he left.

At about 8:30 P.M., just as Mutalipassi was about to close the store, the man returned and indicated that he wanted to purchase a fifth of Russian vodka. Mutalipassi got the vodka from the back of the store and his "customer" placed a $20 bill on the counter. Upon his return to the counter, however, Mutalipassi was told, "Give me it all." The "customer", who had a gun pointed at Mutalipassi, then ordered the latter to "get down" on the floor. Mutalipassi obliged and stayed on the floor until he heard the front door open and close. While on the floor, Mutalipassi had heard the clicks of the spring clips in the cash register, thus indicating that the money was being taken therefrom. After the robber had left, Mutalipassi discovered that about $190 had been taken; the fifth of vodka was still on the counter.

The police arrived in 10 to 15 minutes and Mutalipassi gave them a description of a man who was about five feet and nine inches tall, with a long, thin face; slight mustache; light brown hair; slight accent. A short time later—Mutalipassi put it at approximately 15 minutes after the robber had left—a detective entered the store with two suspects. Mutalipassi identified defendant as the robber as he was entering the store with the detective. *According to Mutalipassi, defendant was not handcuffed at the time.*

Robert Williams, a police officer for the City of Yonkers, testified that he was on radio patrol, two blocks from the liquor store, when he received a radio notification of the robbery (between 8:30 and 8:35 P.M.). He responded to the scene and questioned a group of people standing across the street while his partner spoke to the employee of the liquor store. One of the bystanders, an 18-year-old girl by the name of Sandra Thela, told him she had noticed a tan ("possibly a

rust color") van circle the area approximately four times. The van had out-of-State license plates and the girl had seen two male occupants. In fact, one of the men in the van—described as having brown curly hair, a slight mustache, and a thin face —had asked her for directions. The girl had seen the van stopped for a while about 50 yards south of the liquor store; she last saw it proceeding south.

After speaking to the girl, Officer Williams joined his partner, who was giving a description of the perpetrator over the radio. Williams recalled his partner describing a white male; five feet and nine inches tall; thin; curly brown hair; slight mustache; and a slight accent. He could not recall whether he told his partner at that time about the description furnished by the girl. As soon as his partner finished broadcasting a description of the robber, Officer Williams broadcast a description of the van. He then went back to the crowd of bystanders and asked the same girl whether it could have been a U-Haul van. She said she was pretty sure it was because "there was writing on the side." Following this conversation, Williams made a second radio transmission stating that the suspect vehicle was possibly a U-Haul van with out-of-State plates.

Williams also testified that 10 to 15 minutes after he and his partner came upon the scene, Police Officer Robert Molinaro arrived with two suspects in the rear of his car. *He did not believe that either defendant or the other suspect was in handcuffs at the time.* After defendant had been identified as the robber, Officer Molinaro gave Williams the keys to the suspects' van with directions that it be brought to police headquarters. Williams picked up the locked van three quarters of a mile to a mile from the scene of the robbery and drove it to headquarters where he returned the keys to Molinaro. The trip from the liquor store to where the van was parked was fairly direct, with only one turn, and two traffic lights. However one of the traffic lights does not always operate on its regular cycle. Williams estimated that the trip took from two to five minutes.

Officer Molinaro testified that while on radio patrol on November 11, 1976, at about 8:30 or 8:35 P.M., or a little thereafter, he received a transmission that an armed robbery had occurred at 315 Saw Mill River Road (the address of the liquor store). According to Molinaro: "They wanted a white male, five foot eight with dark hair * * * operating a light van with out-of-State plates on it." En route to the scene of

the robbery, he noticed a U-Haul van with California plates parked on the side of the road facing in the direction opposite to that in which he was traveling. The van was about a half mile from the scene of the robbery.

As he approached the van, Molinaro slowed down and observed two white males in the front seat. He then stopped the radio patrol car and approached the driver's side of the van while his partner did the same on the passenger's side. *Both officers had their guns drawn.* The occupants were ordered to get out of the truck; "[t]he driver fit the description that was given over the air." Molinaro "put both parties against the van" and they were frisked for weapons. They were then asked what they were doing in the area. They said they were unfamiliar with the area and that they were waiting for a friend "who was in the process of dropping off a few girls who lived in the vicinity." *Molinaro then advised them of the liquor store robbery, told them they were "possible suspects", handcuffed them and placed them in his car. Prior to driving to the liquor store, Molinaro made a cursory check of the van—"to make sure there was no one else there" —and then locked it.*

Molinaro stated that he did not "arrest" the suspects until after they were identified at the liquor store. Prior to that time he was still "in the investigatory stage" and the men were handcuffed only to "safeguard" the police. *Before arriving at the scene, the handcuffs were removed from the defendant and his companion at the request of Detective Chiaverino.*

With respect to the van, Molinaro testified that it is Yonkers City Police procedure to impound any vehicle involved in a crime and to inventory its contents. That is what was done here, and during the inventory at police headquarters, Officer Molinaro found a .32 caliber revolver in the back of the van. At that time the police also found a contract for the rental of the U-Haul. It is unclear when defendant was asked for his driver's license. On direct examination, Officer Molinaro was asked if there ever came a time when he "requested or received anything from the defendant in the way of identification." His response was, "Well, we received a driver's license down at D." (Apparently, the "D" is the detective division at police headquarters.)

On the basis of the foregoing testimony, the Trial Judge rendered an oral decision in which he: (a) suppressed a state-

ment made by defendant at the time he was stopped (apparently that he was waiting for a friend); (b) denied defendant's motion to suppress identification testimony; and (c) denied defendant's motion to suppress the gun. The Trial Judge found that defendant was not under arrest "when the police officer approached him at the van" but that he "was in custody" and was thereby entitled to his *Miranda* warnings. The court never actually touched upon the quantum of information (i.e., probable cause or reasonable suspicion) necessary to support the action of the police in forcibly transporting defendant back to the scene of the robbery. The court's only comment on this phase of the hearing was as follows: "the procedures used by the police is a proper one, which had been condoned by the Appellate Courts on numerous occasions of bringing a person immediately back to the scene for identification so that he could either be released or charged. It took place within fifteen minutes of the robbery and was not done in a suggestive manner".

### DETERMINATION ON APPEAL

██ As a general rule, the practice of exhibiting a suspect to a witness for identification without benefit of a lineup, absent exigent circumstances, has been condemned as violative of due process. However, a showup identification is not per se *improper and may be sustained where the witness is* shown the suspect within a relatively short time after the incident. Testimony of an identification made at a showup should not be suppressed unless it is found, upon consideration of the totality of circumstances, that the confrontation was so unnecessarily suggestive and conducive to irreparable mistaken identification, that the defendant was denied due process of law *(People v Smith,* 46 AD2d 639, affd 38 NY2d 882). In this instance the defendant was returned to the scene of the crime within 15 minutes to a half hour after the commission of the crime, and the handcuffs were removed from him before the identification was made. The record is devoid of any evidence that the focusing of the eyewitness to the robbery upon defendant was due to suggestive police action or arrangements (cf. *People v Logan,* 25 NY2d 184, 194).

Furthermore, it has been held that not only is it not improper for the police to return a freshly apprehended suspect to the scene of the crime for identification by one who

has seen the culprit minutes before, but that such procedure in certain instances " 'if anything promotes fairness, by assuring reliability' " *(Russell v United States,* 408 F2d 1280, 1284, cert den 395 US 928). Although the *Wade-Gilbert* rules apply to prearraignment viewing, speedy viewings on the scene, benefit both law enforcement authorities and the defendant. If the accused is identified as the culprit, the witness' recollection will be as fresh and reliable as his capacity and the situation permit. If he is not identified, he may then be released with a minimum of delay *(People v Blake,* 35 NY2d 331; *People v Logan,* 25 NY2d 184, 194, *supra).*

■ That the exigencies for a showup in this case far outweighed those calling for observance of more formal *Wade-Gilbert* rules can be gleaned from the following circumstances: (1) the time of the night at which the crime occurred, about 8:30 P.M.; (2) the place and time the defendant was apprehended by the police, to wit, a relatively short distance from the scene of the crime, at approximately 8:45 P.M.; (3) the police were aware that the employee of the liquor store, who had given them the description of the perpetrator, was probably still at the scene; (4) the use of a showup would permit a speedy and more accurate determination as to whether the person apprehended was the perpetrator; and (5) holding the defendant for a lineup would entail a long delay resulting from the need to provide counsel to defendant to observe the lineup, and might cause detention of an innocent suspect (see *People v Digiosaffatte,* 63 AD2d 703, 704; *People v Jones,* 38 AD2d 745; *Russell v United States,* 408 F2d 1280, 1283-1284, *supra).*

Thus the argument of defendant on appeal that the identification must be suppressed because it was the fruit of an illegal arrest is clearly without merit. In this instance the police were given a description of the person who committed the robbery by one of the employees of the store, a second description by another person of one of the occupants of a van seen circling the area approximately four times which physical description closely matched that given by the employee, and finally a description of the van which included information that it had out-of-State plates. After the police at the scene had broadcast a radio lookout, the responding squad car promptly encountered defendant a relatively short distance away. Under the circumstances it was not unreasonable for the responding officers to believe that the defendant was the

person they were seeking in view of the fact that both defendant and the van matched the descriptions received via an official radio transmission just a few minutes earlier (cf. *People v Weis*, 32 AD2d 856, 857, cert den 397 US 1047). Indeed, the decision of the responding police officers to take defendant into custody, return him to the scene of the crime, and impound the van can best be described under the circumstances, as alert, efficient and responsible police action.[1]

As succinctly stated by former Chief Judge BREITEL in *People v Logan* (25 NY2d 184, 194, *supra):* "It is quite evident that the *Wade-Gilbert* standards were not designed to frustrate good police work which produces the prompt or instantaneous and therefore the most reliable identification of culprits."

In my opinion, the failure of the responding police officers under the circumstances to have restrained defendant's movement at the outset would have constituted a dereliction of official duty. Concomitantly, for the responding officers to have followed up the restraining action they did take by merely asking defendant and his companion for permission to search the vehicle, whether they minded either waiting until the complainant could be brought from the scene or else going voluntarily to the scene of the crime for a showup, and then releasing them and the van after an expected negative response, would have transformed what was initially excellent police action, into part of an epic comedy of "Keystone cop" dimensions.

In *Bates v United States* (405 F2d 1104, 1106) Judge BURGER (now Chief Justice of the United States) cogently stated:

"Prudent police work would confine these on-the-spot identifications to situations *in which possible doubts as to identification needed to be resolved promptly* * * *

"Our review of the circumstances surrounding the apprehension of Appellant and the police conduct which led to his identification satisfies us that the claim that Appellant was denied due process of law is without merit;[2] there was no

---

1. See *Russell v United States* (408 F2d 1280, 1281, n 3, cert den 395 US 928), where in a footnote the Circuit Court of Appeals for the District of Columbia held on somewhat similar facts that "[a]ppellant's contention that the police lacked probable cause for an arrest at this juncture is plainly without merit."

2. In *Bates,* the arrest of appellant by the police about 30 minutes after he committed indecent assaults upon the two female complainants was actuated by police officers observing a "white cloth wrapped around his [appellant's] hand" a short

'substantial likelihood of irreparable *misidentification.'* To the contrary, the police action in returning the suspect to the vicinity of the crime for immediate identification in circumstances such as these fosters the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh." (Emphasis supplied.)

In this case it is manifest that whatever doubts the responding police officers had as to defendant committing the robbery at the nearby liquor store could best be resolved promptly and reliably by transporting him to the scene of the crime. The prompt on-the-scene confrontation was, in the simple and *apropos* language contained in *United States v Sanchez* (422 F2d 1198, 1200), "consistent with good police work."

■ With respect to the impounding of the van, it follows that having a reasonable basis for taking defendant into custody for an immediate on-the-scene identification, the responding officers also had probable cause to believe that such vehicle contained the fruits of the crime, and/or the weapon used at the time of the robbery. Thus they were justified in taking custody of the van and searching it, without a warrant, either at the situs of the stop, or at the police station after it was removed from such situs (see *Chambers v Maroney,* 399 US 42; *Carroll v United States,* 267 US 132; *People v Clark,* 45 NY2d 432; *People v Kreichman,* 37 NY2d 693).

Moreover, it is also true that the police had the right, after seizing the van, to inventory its contents and use as evidence against defendant at the trial any pertinent matter discovered therein (cf. *People v Butler,* 44 AD2d 423).

■ Two other issues raised by defendant may be quickly disposed of. First, defendant's contention that the weapon conviction herein must be reversed because of the unconstitutionality of subdivision 3 of section 265.15 of the Penal Law is without merit. The constitutionality of such law, which makes the presence of a weapon in a motor vehicle presumptive evidence of illegal possession by all of its occupants, was recently enunciated by the Supreme Court of the United States in *County Ct. of Ulster County v Allen* (442 US 140).

---

distance from the scene. "This coincided with the complaining witness' statement that her assailant 'had a bandage on his left hand' " (405 F2d 1104, 1105).

■ Second, with respect to defendant's assertion that the sentence of imprisonment imposed by the trial court on the robbery conviction of 5 to 15 years was excessive, in my opinion the action taken by the trial court in that regard was a proper exercise of its discretion and was determined with knowledge of the facts and circumstances of the case. Accordingly, the judgment of conviction should be affirmed.

MARGETT, J. (dissenting). Significantly, the issue in virtually all the cases cited by the majority was whether the *Wade-Gilbert* standards were offended by a prompt, on-the-scene identification procedure. The legal issue in this case is whether a suspect can be handcuffed and forcibly transported somewhere in a police car, absent *probable cause* to believe the crime had been committed by that suspect. The factual issue is whether the arresting officer had probable cause. I believe the answer to both questions is negative.

According to the arresting officer, Robert Molinaro, the only description he had was of "a white male, five foot eight with dark hair * * * operating a light van with out-of-State plates on it." After receiving this very general description, he observed a U-Haul van* with California plates parked on the side of the road. Two white males were observed in the front seat (the officer testified on cross-examination that when he approached the van he could see "two white mouths").

The police car was brought to a stop and Officer Molinaro and his partner approached either side of the van with their guns drawn. The occupants were ordered out of the truck; "[t]he driver fit the description that was given over the air" (i.e., he was a white man with dark hair and was "five foot eight"). Both parties were put up against the van and frisked for weapons. They were then asked what they were doing in the area and they answered that they were unfamiliar with the area and were waiting for a friend "who was in the process of dropping off a few girls who lived in the vicinity." At this point, the men were told that they were "possible suspects" in a liquor store robbery. They were handcuffed, placed in the police car and transported to the scene of the robbery. It does not appear that they were even asked for identifications since the rental contract for the van was found only after that vehicle had been impounded, and Officer

---

* It appears that the van had "rust" colored lettering on the sides.

Molinaro testified that he "received a driver's license down at D" (meaning the detective division at police headquarters).

On these facts, I do not believe the quantum of information possessed by the arresting officer ever reached the level of probable cause. I would agree that the initial "stop" was justified and reasonable. Given the fact that an armed robbery had just occurred, the police could, in order to insure their own safety, properly direct the men to exit the van (see *People v Diaz*, 41 NY2d 876). They could also at this stage, act with their guns drawn (see *People v Wiggins*, 50 AD2d 910), and conduct a frisk, for their own protection. But absent any additional facts which would extend the officers' suspicions beyond what they already knew, it was unreasonable to handcuff these men and transport them somewhere in a police car.

In *United States v Brignoni-Ponce* (422 US 873), the United States Supreme Court made it clear that a valid stop can become illegal if its scope is unreasonably extended *(United States v Chamblis*, 425 F Supp 1330, 1334). In discussing stops made by the border patrol in connection with their duties with respect to aliens seeking to enter the country illegally, the Supreme Court held that "when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion" (422 US, at p 881). "The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, *but any further detention or search must be based on consent or probable cause"* (422 US, at pp 881-882; emphasis supplied; see, also, *Dunaway v New York*, 442 US 140).

Likewise, in *United States v Chamblis (supra)*, it was held that while a narcotics agent acted properly in making the initial stop of a suspicious person, the action of the agent in "requesting" that the person accompany him to a private office at the airport was an unreasonable extension of the scope of the stop. "Between the time he was initially stopped and the time he was 'requested' to accompany the agent to the room, the only information obtained by the agent was that the defendant did have some identification and claimed to have lost his airline ticket. These additional facts were not enough to establish probable cause" (425 F Supp, at p 1334).

At bar, no additional facts came to the attention of the police officers after their initial observations which would ripen their suspicions into the belief that the men they had stopped were probably the robbers (cf. *People v Rosemond,* 26 NY2d 101; *People v Magnifico,* 59 AD2d 914; *People v Plunkett,* 56 AD2d 878). Rather than taking the action that they did, the police could have done at least four other things which would have been less intrusive. They could have called in and asked for a further description of the perpetrator and the van (had they done that, they would have been told that a U-Haul van may have been involved and they would have received a fairly detailed description of the suspect—chances are they would *then* have had probable cause); they could have asked the suspects for permission to search the vehicle; they could have asked the suspects if they minded waiting until the complainant could be brought to the scene (see *People v Plunkett, supra);* or they could have asked the suspects whether they would go voluntarily to the scene of the crime. Any of the foregoing approaches would have comported with the law. In my opinion, the approach actually taken did not.

The subsequent identification and search of the van were tainted by the unlawful seizure of defendant (see *Brown v Illinois,* 422 US 590). Accordingly, the identification testimony of Mr. Mutalipassi, and the gun recovered as a result of the search, should be suppressed, the judgment reversed, and the indictment dismissed.

DAMIANI, J. P., and COHALAN, J., concur with TITONE, J.; MARGETT, J., dissents and votes to reverse the judgment and dismiss the indictment, with an opinion, in which MANGANO, J., concurs.

Judgment of the County Court, Westchester County, rendered October 27, 1977, affirmed.