THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
JERRY KNOWELL, Appellant.

Second Department, June 27, 1983

APPEARANCES OF COUNSEL

*Edward J. Waldman* for appellant.

*Denis Dillon, District Attorney (Samuel E. Rieff* and *Judith R. Sternberg* of counsel), for respondent.

OPINION OF THE COURT

BOYERS, J.

On the evening of February 1, 1980, Beatrice Walker was found prone behind some bushes in the schoolyard of the Holy Redeemer Church in Freeport, New York. She was nude, had been beaten about the face, was bleeding from the mouth, and died some six days later as a result of cerebral hemorrhage and contusions, and fractures of the ribs.

The paramount issue at trial was the identification of Ms. Walker's assailant. The People's case rested in the main upon the identification testimony of two witnesses; only one, however, saw the actual incident.

Troy Hooks, a taxicab driver, testified that at about 7:30 P.M. on the evening in question, he received a call to pick up a fare at 19 Andrews Avenue in Roosevelt, New York. Upon his arrival at that location, Hooks was approached by a black male (later identified as defendant) who requested that Hooks transport him to another location in Roosevelt. At that point, the deceased, Beatrice Walker, came out of the house at 19 Andrews Avenue and requested that the driver take her to the bingo hall at the Holy Redeemer Church on Pine Street in Freeport. She sat in the back seat of the cab, directly behind its operator. Defendant then determined that since the driver could not take him to another location in Roosevelt, he would go to Plaza West in Freeport, which is about three blocks from the Holy Redeemer Church. Hooks testified that defendant, who was wearing a black and white hat, a tan jacket and blue jeans, sat beside him for the journey. A black and white corduroy and fleece hat recovered from the vicinity of the crime scene was identified by the witness as being the hat, or one just like the hat, defendant was wearing that evening.

Hooks then proceeded to 216 Ray Street where he picked up another fare. This rider also wanted to go to Plaza West. When the vehicle arrived at that destination, only the

passenger from Ray Street alighted. The other male rider, defendant, announced that he had changed his mind and now wanted, in the witness' words, "to go to bingo". Defendant did not converse with Beatrice Walker during their journey, but did remark that "[w]e're late for bingo". Hooks transported the occupants of his vehicle to the school at the Holy Redeemer Church, where the bingo hall was located. The deceased and defendant exited the vehicle, defendant disembarking first.

Upon cross-examination it was elicited that Hooks had been mistaken when he told the jury that he had never seen defendant before — he had told the police that he remembered seeing defendant in the Roosevelt area prior to the night in question. Further, Hooks had described the man who sat next to him in his cab as being 30 to 35 years old and between 5 feet, 10 inches and 6 feet, 1 inch tall. Nevertheless, he subsequently picked defendant, who was 23 years old and 6 feet, 4 inches tall, out of a lineup.

Joann Sarro testified that she arrived at the Holy Redeemer Church that evening at about 7:50 P.M. to play bingo. As she approached the school, she saw two people by the front stoop: one was "crouched" on top of the other. The person on top, a man who was wearing a tan jacket, was "pushing down" onto a smaller person below who had assumed a fetal position. According to Sarro, the area was well lit by a light above the stoop and one directly opposite across the street. Upon her approach, the man, whom she identified as defendant, looked up and the witness saw his face for about seven or eight seconds. The entire incident was within her view for about a minute prior to her entry into the school. Upon cross-examination, Joann Sarro admitted that she had testified on a prior occasion that she had observed the man's face for only two to three seconds. Further, she was late for bingo and went into the church to play without bringing her observations to anyone's attention until about half an hour later.

A third witness for the People, Thomas Fagan, testified that he exited the bingo hall at about 8:15 P.M. on the evening in question, whereupon he observed "someone in the bushes [at the back of the school] stomping on something." Fagan yelled "stop", at which time the person, a

hatless black male, approximately 5 feet, 10 inches tall, garbed in a tan jacket and dark trousers, turned, ran toward a fence and then wheeled around and went off in another direction. The witness did not observe a hat lying in the immediate vicinity.

The defense witnesses placed defendant in the company of his family at the time of the incident. More specifically, Erline Knowell, the defendant's mother, testified that she had resided with her son in an apartment house at 33 Buffalo Avenue in Freeport for 10 years. Her next door neighbor, a Miss Cummings, was Beatrice Walker's sister and the witness had seen the deceased on past occasions in the hallways and pathways around 33 Buffalo Avenue. Defendant returned from work at about 6:00 P.M. on the day in question, laid down on his bed in the living room and did not leave the apartment until later that evening when he accompanied his mother to her sister Mattie Brooks' home, to attend a wake.

This alibi testimony was corroborated in part by other witnesses for the defense. Paulette Barmore, defendant's cousin and daughter of Mattie Brooks, testified that she picked defendant and his mother up in her car at about 8:30 or 8:45 P.M. and took them to her father's wake, arriving there a little before 9:00 P.M. Defendant's sister, Antoinette Knowell, who accompanied Paulette Barmore, testified that she arrived home between 8:30 and 8:45 P.M. and went with defendant and their mother to the wake. This witness and her mother identified a black and white hat found in the 33 Buffalo Avenue apartment as belonging to defendant. This garment was similar to the hat allegedly worn by the perpetrator and found near the crime scene.

Defendant was subsequently convicted of murder in the second degree, manslaughter in the first degree and robbery in the first degree. Based upon the facts recited above, it becomes clear that the identity of Beatrice Walker's assailant constituted the primary concern in the case and, accordingly, it could properly be expected that the trial court would furnish the jury with specific guidelines for the evaluation of identification testimony. Indeed, where the issue of identification is paramount, it is incum-

bent upon the trial court to give an appropriate charge (see *People v Daniels,* 88 AD2d 392, 400-401; *People v Gaines,* 80 AD2d 561; *People v Merriman,* 79 AD2d 619; *People v Gardner,* 59 AD2d 913). Unfortunately, notwithstanding an exception by defense counsel and request for further instructions (albeit inartfully articulated), no identification charge was given. As this court explained in *People v Daniels (supra,* p 400, opn by O'CONNOR, J.), the real issue in "many, if not most, pure identification cases" is not the veracity of a particular witness, but, rather, "whether or not the witness is mistaken — however honest or truthful that mistake might be." An appropriate charge in such cases should instruct the jury to focus upon "accuracy as well as veracity, weighing all the facts and circumstances surrounding the giving of two different descriptions, one of a stranger, the other of [the] defendant" (*People v Daniels, supra,* pp 400-401, and see pattern jury charge cited at p 401, n). The County Court's failure to so instruct the jury constituted reversible error.

Further, because alibi was a major question in the case, the jury should have been furnished with clear, adequate guidelines with respect to this issue. The court charged the jury as follows: "Now, the defendant has presented what is commonly known as an alibi defense. Really this is no defense at all. It's an attempted rebuttal of the People's attempt to prove the defendant was there and did what they claim he did. You have already been instructed that it is up to the People to prove the defendant's guilt beyond a reasonable doubt and this includes all the elements of the crime, including his presence at a stated place and his committing or participating in certain acts at that place at a given time. The alibi evidence which the defendant has placed before you seeks to convince you the defendant was elsewhere at the time and, therefore, could not possibly have committed the acts charged. Whether or not you believe he was or was not so present and, therefore, could or could not have done what he has been charged with doing, it is for you to decide along with all the other facts in this case."

Although the language used did remind the jury that the burden of proof remained upon the People, the charge

was flawed in that the court failed to explain that defendant had no burden of proof with respect to his alibi or that whether or not the jury credited the alibi testimony, the People must still prove beyond a reasonable doubt that defendant was in fact the person who committed the crime (see *People v Vera,* 94 AD2d 728, and cases cited therein). It is also inferable that the lack of clarity and the tenor of the court's instruction may have cast unwarranted suspicion on defendant's proof, a factor compounded by the court's failure to marshal the relevant evidence (see *People v Merriman, supra).* CPL 300.10 (subd 2) has not entirely eliminated the requirement that the court marshal the evidence; it must still do so to the extent necessary to explain the applicable principles of law to the factual issues in the case (see *People v Clayborn,* 50 AD2d 952; see, also, *People v Goods,* 75 AD2d 650; *People v Carney,* 73 AD2d 972).

■ We additionally note that although no exception was taken to the statement, it was error for the court to qualifiedly preface its proper instruction to the jury during *voir dire* — that the fact that defendant does not testify is not a factor from which any unfavorable inference may be drawn — with the improper comment that defense counsel had specially requested such instruction (see *People v McCargo,* 67 AD2d 955; see, also, *People v Abreu,* 74 AD2d 876; *People v Muir,* 51 AD2d 859; CPL 300.10, subd 2). Admittedly, this error was not repeated during the court's charge to the jury at the conclusion of the case and, thus, the jury's attention was not directed to the remark (see *People v McCargo, supra).* However, the evidence of defendant's guilt was not overwhelming so there can be no consideration of any doctrine of harmless error (see *People v Crimmins,* 36 NY2d 230, 241; see, also, *People v Johnson,* 57 NY2d 969, 970; cf. *People v McCargo, supra; People v Strawder,* 54 AD2d 743).

■ There is, however, no merit to defendant's contention that his cross-examination of Troy Hooks was improperly curtailed by the court's refusal to allow counsel to question Hooks "regarding his possible confinement to a mental hospital and his ongoing psychiatric treatment". Generally a witness is presumed competent, but evidence as to his

mental condition may be admissible on the issue of credibility or the capacity of the witness to perceive and recall events (see *People v Rensing,* 14 NY2d 210, 213; *People v Mandel,* 61 AD2d 563, 572, revd on other grounds 48 NY2d 952, app dsmd 446 US 949, reh den 448 US 908). The only offer of proof with respect to Troy Hooks' mental condition was defense counsel's statement that he had information that the witness was "currently under a psychiatrist's care." Upon further inquiry, counsel failed to demonstrate a good-faith basis for believing that the witness' mental condition affected a material issue in the case, for example, Hooks' ability to perceive or remember. Rather, counsel responded ambiguously and in the hypothetical. The County Court, therefore, properly exercised its discretion.

In summary, while "in this imperfect world, the right of a defendant to * * * a fair trial, does not necessarily guarantee him a perfect [one]" (*People v Rivera,* 39 NY2d 519, 523), and a review of the record evidences sufficient evidence, if credited by the jury, to support a verdict of guilty, we are of the opinion that the errors in this particular defendant's trial served to undermine its fairness, and therefore the judgment must be reversed and the matter remitted for a new trial.

We have reviewed the other contentions raised by defendant and find them to be without merit.

DAMIANI, J. P., TITONE and LAZER, JJ., concur.

Judgment of the County Court, Nassau County, rendered February 3, 1981, reversed, on the law and as a matter of discretion in the interest of justice, and new trial ordered.