■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANTHONY HAMILTON, Appellant.—Judgment, Supreme Court, Bronx County (Elbert Hinkson, J.), rendered April 22, 1985, convicting the defendant, after a jury trial, of robbery in the first degree, and sentencing him to an indeterminate term of imprisonment of 4 to 12 years, reversed, on the law and as a matter of discretion in the interest of justice, and the case is remanded for a new trial.

The defendant was convicted after a jury trial of robbery in the first degree, and sentenced to an indeterminate term of imprisonment of 4 to 12 years. The testimony in this brief trial may be quickly summarized.

The complaining witness, Jeffrey McQuilla, testified that shortly after midnight on April 26, 1984, while returning home after completing a carpentry job, he was approached by three men, two of whom threatened him with a knife, and who took from him $50, money earned that day, as well as a circular saw. He identified the defendant as one of the three participants in the robbery, and further testified that he had identified the defendant in a lineup conducted about 5:00 P.M. on the same day, April 26. A police officer testified that he arrested the defendant on April 26 after an investigation, arranged a lineup, identified a photograph of the lineup, and pointed out the position in the lineup occupied by the defendant.

Testifying in his own behalf, the defendant stated that at the time described by the complaining witness he was home with his wife, three children, and a young woman friend of the family who stayed with them from time to time and occasionally acted as a baby-sitter for the children. He testified that he had returned home at 9:00 P.M. on April 25, had gone to bed with his wife around 11:00 P.M. and watched "Hawaii 5-0" on his television set, which program came on at about midnight, and that he fell asleep while the program was still on.

Twana Waiters testified that she had been staying at defendant's home for some days, that he had come home between 9:00 and 9:30 P.M., and that defendant had remained home with his wife, children, and the witness for the rest of the night.

Although the evidence was sufficient to support the jury's verdict, we have concluded that the conviction must be reversed and the case remanded for a new trial because the fundamental fairness of the trial was severely impaired by repetitive improper prosecutorial trial tactics.

In his opening statement, after a brief outline of the event, the prosecutor went on to say: "Now, you're going to hear from Jeffrey McQuilla, you're going to hear him tell you what happened to him. But, what's also important here too, is the fact that you're going to hear from an officer Pablo Rosa, who arrests, based upon an investigation—now, an investigation is composed of hearsay, so you can't hear that, but based upon an investigation Anthony Hamilton was arrested and he was taken to the precinct."

The testimony of Officer Rosa was, of course, not "important", since, as indicated in the above summary, it did not

contribute any probative evidence whatever linking the defendant to the crime charged. What was clearly "important" to the trial assistant was to use the opening as a vehicle for assuring jurors who might be hesitant to convict on the basis of an identification by a single witness that there was other evidence connecting the defendant with the crime, although the details of that evidence, because of a legal rule, could not be presented to them. This obvious effort to convey to the jury that there was information linking the defendant to the crime in addition to that which the jury had the right to consider was grossly improper. Although not objected to, the obvious potential of what the trial assistant said to influence unfairly the outcome of the trial requires us to reach the issue in the interest of justice.

In some ways even more disturbing is an unusual tactic pursued by the trial assistant during an extended part of his cross-examination of the defendant. Taking advantage of an inadvertent error by defense counsel in referring to the date of the robbery, the trial assistant cross-examined the defendant aggressively, at length, and in a sarcastic and demeaning manner on the basis of the literal meaning of an answer that obviously was not the intended meaning, and could not conceivably have been the intended meaning.

In a preliminary question on direct examination, referring to the testimony of the complaining witness with regard to a robbery occurring "on the night of April 26, 1984", defense counsel asked the defendant whether he remembered that night. Responding to that which the question was clearly intended to elicit, the defendant testified that he was at home on that night with his wife, children, and Twana Waiters. That the defendant meant to refer in those answers to the night on which the complaining witness had testified to the robbery having occurred, and did not intend to claim that he was home on the following night, when he was in police custody, seems to us free from any doubt. Any possible confusion on that score—and we see no reasonable basis for any confusion—was clarified by the defendant's later testimony in which he stated in detail that he had come home at about 9:00 P.M. on April 25, went to bed with his wife at about 11:00 P.M., and watched a television program (Hawaii 5-0) that started at about midnight, and during which he fell asleep.

Notwithstanding the above, the trial assistant, near the beginning of his cross-examination, questioned the defendant at length on the premise that the defendant had testified to having been home with his family both on April 25 and April

26, and to having watched "Hawaii 5-0" on both nights. Brushing aside the efforts of the somewhat inarticulate defendant to clarify that which should have required no clarification, the trial assistant ridiculed the supposed claim of the defendant that he had watched the same program on two succeeding nights.

The flavor of the cross-examination may be gathered from the following questions and answers:

"Q So, Hawaii 5-0 is on every night, Mr. Hamilton?

"A No, sir. They normally skip one day. One day Hawaii 5-0 would come on and the next day Magnum would come on around the same time then Hawaii 5-0 would come on.

"Q So, you watch Hawaii 5-0 all the time; don't you?

"A One night I watch Magnum on television and one night I watched Hawaii 5-0.

"Q Well, you just told this jury that the night of the 26th, you watched Hawaii 5-0 and the night of the 25th you watched Hawaii 5-0. You mean it was on two nights in a row or did it skip—

"A Well, they locked me up on the 26th.

"Q Is that the night Hawaii 5-0 was on?

"A It was on the 25th, the night of the 25th * * *

"Q Well, what did you mean when you told this jury when I asked you if you watched Hawaii 5-0 on the night of the 26th, you said, 'Yes?' What did you mean by that?

"A Because Hawaii 5-0, it lingers on until after 12 o'clock and it turns into the 26th.

"Q So, the night of the 26th, it was still lingering on and you watched it?

"A Yes, sir.

"Q You mean it lingered on from the morning till the night?

"A No, it lingers on from the 25th, that night until the morning of the 26th."

After a close study of this record, we are unable to accept that the trial assistant ever, in fact, believed that the defendant intended to testify that he had been at home watching Hawaii 5-0 on April 26, the night in which he was in police custody. What emerges clearly is that the trial assistant took advantage of an inadvertent slip in a preliminary question by the defense lawyer to confuse the defendant and to ridicule him on the basis of a pretended belief that the defendant had given manifestly absurd testimony, testimony which quite

clearly he had not intended to give. In this extended exercise, which consumed some four pages of the transcript on cross-examination and was renewed on re-cross-examination, the trial assistant systematically violated his fundamental obligation to be fair.

Finally, in his summation, the trial assistant made the following argument to the jury: "But, I want you to think back when your son or your mother came home and said, 'I was mugged,' and he or she was alone, if they tell you that, 'I can identify that guy, I can recognize him,' wouldn't you want them to be heard fairly in the courtroom? Would you want a jury to be reluctant to convict if it had been your son or your mother, if that was the only witness?"

It was, of course, improper for the trial assistant to urge the jury to evaluate the testimony of the complaining witness as they would have wished the testimony of a close relative to be evaluated by another jury. The fundamental duty of a jury is to determine the factual issues of the case without sympathy or prejudice, an obligation fundamentally incompatible with the trial assistant's argument as to how the complaining witness in the case should be evaluated.

This improper argument was a prologue to the principal argument advanced by the trail assistant in his summation, and one that merits separate discussion. In substance, the trial assistant argued to the jury that the complaining witness was "honest", something not in fact disputed in the defense summation, and that the single issue presented by the facts of the case was whether or not the complaining witness was honest.

With regard to this argument, we observe that in the usual situation the weight of arguments by counsel to the jury in summation are a matter for the jury to consider, and the fact that one or more arguments advanced are meritless is not ordinarily a matter justifying judicial concern. Moreover, it may well be appropriate for a trial assistant to address an issue not raised or contested by defense counsel because of experience that individual jurors may from time to time be concerned with issues not directly raised by defense counsel. In any event, in this case at least one comment by defense counsel in his summation could reasonably have been viewed as raising in an oblique way a question as to the complaining witness' honesty.

However, in a case in which it is plain that the principal issue presented was the reliability of the identification by the

complaining witness of someone not known to him whom he had seen briefly under nighttime circumstances, we think it was wholly improper for the trial assistant to develop as the central theme of his summation that the single issue before the jury was the honesty of the witness, and to argue that no issue would remain once that question was resolved in favor of his honesty. *(Cf. People v Perez,* 102 AD2d 797, 798; *People v Knowell,* 94 AD2d 255, 259.)* Concur—Kupferman, J. P., Sandler, Ross, Carro and Wallach, JJ.