■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RICARDO RAMIREZ, Appellant.—Appeal by the defendant from a judgment of the Supreme Court, Queens County (Leahy, J.), rendered March 6, 1985, convicting him of burglary in the second degree and criminal mischief in the fourth degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of that branch of the defendant's omnibus motion which was to suppress identification testimony.

Ordered that the judgment is reversed, on the law, and a new trial is ordered.

A review of the trial testimony indicates that a close question of the identification of the perpetrator was presented for the jury's consideration. Specifically, the complainant testified that he had discovered two men, who were "not very tall, not too young, not too old", attempting to burglarize his apartment. He observed the two men, seeing the face of only one of them from three to four meters away, "[f]or a few seconds, not very long", before he ran out of the apartment. As the complainant ran downstairs to the superintendent's apartment, he caught a view for "two, [or] three seconds" of the two men running down the stairs, but he did not see their faces at that time. Thereafter, the complainant and the superintendent's son chased the two fleeing men.

During the chase, which lasted about two to three minutes, the complainant noticed that the man whose face he had seen

earlier wore a red shirt, blue jeans and sneakers. At one point during the chase, the red-shirted man turned back his head to look at the complainant, but by that time the distance between them was "far".

According to the superintendent's son, he only saw the backs of the men during the chase; he never saw their faces. One of the men wore a red and white shirt and jeans. Although the complainant testified that this red shirt had "little tiny stripes", the superintendent's son described the pattern as "checkered". Further, while the complainant described the other man's shirt as white, the superintendent's son testified that the other man's shirt was dark blue.

When the two fleeing men split up, the superintendent's son continued to chase the one with the red checkered shirt, but eventually lost sight of him after about two minutes. The closest he got to either man was approximately 122 feet.

About two minutes after he had lost sight of the man with the red checkered shirt, the superintendent's son caught sight of a man walking out of a yard. The man was reading a newspaper and walking along "[l]ike a normal person, average" and he was not breathing heavily. The superintendent's son recognized him as the fleeing man because he had the same clothes (red checkered shirt) and hair ("curly" in the back) as the man he had been chasing.

About seven or eight blocks from the apartment building, the superintendent's son, who had been walking behind the red-shirted man, stopped a police car and told Police Officer Robert Murray that the man walking on the sidewalk 25 feet away had burglarized an apartment in his building. Murray stopped the red-shirted man and asked him what he was doing in the area. The man looked at Murray as if "bewildered" and answered by "mumbling" in an "incoherent manner" but he did not try to flee. The superintendent's son claimed that this red-shirted man was the man he had chased, and that he had never seen his face but he saw his clothes. The superintendent's son identified the defendant as the man Murray had stopped on the street. He could not identify the defendant as the burglar.

Subsequently, the complainant was taken to the precinct where he identified the defendant as one of the men that was in his apartment. According to the complainant, the defendant was wearing the same shirt as he wore in the complainant's apartment; no other persons at the station house were wearing red shirts. However, upon seeing a photograph of the

defendant taken on the day of his arrest, the complainant initially stated that while the face was the face of the burglar, the defendant was not wearing the same shirt. Then he changed his testimony and claimed that it was the same shirt, but that the shirt worn by the burglar "looked more red", and then he conceded that he was not sure concerning the shirt and only remembered that its color was red.

Finally, while the complainant testified that Police Officer William Landy, who had conducted the showup, claimed that the defendant had been running, based upon feeling the defendant's heartbeat, that testimony constituted inadmissible hearsay. Further, Officer Landy testified that he did not recall whether the defendant had been breathing heavily upon his arrest. Moreover, Landy did not testify to feeling the defendant's heartbeat or to stating that the defendant had been running.

Under these circumstances, we find that it was reversible error to deny the defendant's request for a specific charge on the issue of identification (see, People v Clarke, 108 AD2d 819). As we stated in People v Clarke (supra, at 820): "The failure of the trial court in the instant case to furnish the jury with adequate guidelines is illustrated by the fact that it did not specifically instruct the jury that the People had to prove identification beyond a reasonable doubt, thus falling short of what is considered to be the minimally acceptable identification charge (see, People v Whalen, 59 NY2d 273, 279). The only reference which could possibly relate to the evaluation of identification testimony was that the jury must consider 'the opportunity that the witness had to observe the facts concerning which he or she testified'. Given the close question of identification presented at trial * * * this reference, without more, was clearly insufficient". Accordingly, the defendant is entitled to a new trial.

The other issues raised by the defendant are either without merit or need not be considered in light of our determination. Brown, J. P., Lawrence and Kooper, JJ., concur.

Weinstein, J., dissents and votes to affirm the judgment appealed from, with the following memorandum: Contrary to the position taken by my colleagues, I am of the view that while a detailed identification charge may have been desirable, the court's charge in the instant case, viewed in its entirety, sufficiently complied with the mandates of People v Whalen (59 NY2d 273). In People v Whalen (supra) the Court of Appeals held that it was not error for the court to refuse a

defendant's request for an expansive charge concerning identification testimony which would emphasize that such evidence is always suspect and deserving of close scrutiny where the minimal charge given by the court was technically correct. While noting that the better practice is to grant a defendant's request and render an expanded charge where identification is in controversy, the court specifically ruled that "[a] judge who gives a general instruction on weighing witnesses' credibility and who states that identification must be proven beyond a reasonable doubt has made an accurate statement of the law. No cognizable prejudice accrues to any party" *(People v Whalen, supra,* at 279).

A review of the record undeniably reveals that the trial court did in fact provide the jurors with ample instructions on weighing the witnesses' credibility. By way of a general instruction, the court charged as follows:

"In determining what evidence you will accept as the judges of the facts, you must make your own evaluation of the testimony given by each of the five witnesses who testified here during the course of this trial and you must determine the weight that you choose to give to any witness's testimony.

"Now, in arriving at your verdict, jurors, you may consider that the testimony of any witness may fail to conform to the facts as they occurred here in Queens County on or about August 6, 1984, for several reasons".

More specifically, the trial court embarked on an extensive discussion of the tests to be applied:

"Now, the same tests you've been using all your lives, the same god-given common sense you've been using all your lives, are the same tests that you're going to use in your deliberations in this case in order to determine the credibility of each of the five witnesses who testified here before you.

"For example, when you discuss among yourselves the testimony of the witnesses—the first witness called by Ms. Howard, Peter Moustakos; the second witness called by Ms. Howard, George Moustakos; the third witness called by Ms. Howard, Police Officer Robert Murray of Highway 3; the fourth witness called by Ms. Howard, Police Officer William Landy of the 114th Precinct; and the fifth and last witness called by Ms. Howard, Marinos Nestores—When you go over the testimony of those five witnesses, both the answers they gave on direct examination and on cross-examination, where Mr. Welkes cross-examined them, you have the right in the search for the truth to consider whether those witnesses were

forthright, reasonable and candid in their individual testimony, or you may, in your search for the truth, consider the interest or lack of interest of any witness, in the outcome of the case.

"You may consider in your search for the truth a motive any witness would have to come to this courtroom and not tell the truth. Or you may consider the motive anyone would have to come to this courtroom and tell the truth. You may consider the bias and prejudice of anyone in your search for the truth. You may consider the appearance of the witness or witnesses as they sat before you and testified. You may consider the demeanor, the manner in which any witness gave his testimony from the witness stand under oath both on direct examination and on cross-examination. You may consider the opportunity that any witness had to observe the fact about which he testified to in your search for the truth. You may consider the probability or improbability of any witness's testimony when viewed in light of all of the other evidence in the case in your search for the truth. Those are all what we call common sense factors, jurors, that may be taken into your consideration in determining the weight, if any, that you will assign to any witness's testimony who testified here during the course of the trial of this indictment.

"Now, ladies and gentlemen of the jury, if you determine during the course of your deliberation that any witness willfully testified falsely as to any material fact in the case, the law permits you, the jury, to disregard completely the entire testimony of such a witness upon the principle that a witness who testifies falsely about one material fact in the case is quite likely to testify falsely about everything in the case.

"However, you are not required to consider such a witness as totally unworthy of belief. You may accept so much of his testimony that you feel is credible, and truthful, and believable, and, disregard and reject that portion which you feel is false".

By any fair and rational standard, the cited segments of the charge provide a correct and comprehensive instruction to the jury on the subject of weighing witnesses' credibility. With respect to the second prong of the *Whalen* test, the charge, when viewed as a whole as opposed to considering isolated passages extracted therefrom *(see, People v Canty,* 60 NY2d 830; *People v Payne,* 111 AD2d 938), put the jurors on notice that the defendant's identification was one of the elements which the prosecution was required to prove beyond a reason-

able doubt. The court accomplished this not in a separate general identification charge but, rather, in the course of its charge regarding the specific elements of both crimes for which the defendant was being tried. By repeatedly conveying to the jurors that it was with respect to "the defendant, Ricardo Ramirez", that each element of the crimes had to be proven by the prosecution beyond a reasonable doubt, the trial court concomitantly conveyed to the jurors that the identification of the defendant as the perpetrator was required to be so proven as well.

The record reveals that the trial court delivered extensive instructions emphasizing the presumption of innocence, the prosecution's burden to prove every element of the crimes charged beyond a reasonable doubt and the general factors relevant to an evaluation of the credibility of witnesses. In contrast to the instant case, many of the cases in which this court has held that the Trial Judge committed reversible error by failing to deliver detailed instructions regarding the specific factors relevant to an evaluation of the accuracy of eyewitness identification testimony involved situations where the defendant's guilt was based exclusively upon eyewitness identification testimony countered by an alibi defense (see, People v Clarke, 108 AD2d 819; People v Jones, 108 AD2d 824; People v Knowell, 94 AD2d 255; People v Gardner, 59 AD2d 913). The instant case is readily distinguishable in that, despite the fact that the prosecution relied primarily upon the testimony of the complaining witness identifying the defendant as one of the perpetrators, there was no alibi defense proffered. Rather, the record contains strong circumstantial evidence linking the defendant to the burglary, i.e., the facts that he was observed by one of the pursuers emerging from a backyard, that he initially failed to respond to the police directive to stop, that he mumbled incoherently when asked what he was doing in the area, and that he was apprehended in the general vicinity of the burglary minutes after its occurrence, at which time he was wearing a red shirt reasonably fitting the description given by the three eyewitnesses who pursued him. In such cases, the failure of the trial court to deliver a detailed identification charge should not be found to constitute reversible error (see, People v Smith, 100 AD2d 857).

Contrary to the inferences drawn by the majority, no indication of mistaken identification was presented on the record. Notwithstanding his inability to recall, at the time of trial, the precise design imprinted on the red shirt which the defendant had been wearing, the complainant's positive identi-

fication of the defendant emanated from his clear recollection of the defendant's face from his brief encounter with him at the scene of the burglary. In fact, the complainant was able to identify a photograph of the defendant based solely upon his recollection of the latter's facial features apart from the ever-present red shirt. Absent the *sine qua non* of an alibi defense and given the strong circumstantial evidence linking the defendant to the burglary, a detailed identification charge in this case was unnecessary and its absence in no way deprived the defendant of a fair trial *(see, People v Smith, supra)*.

Contrary to defendant's claim, the hearing court did not err in denying that branch of his motion which was to suppress the identification testimony. The showup, which occurred at the police precinct shortly after the crime, was neither unnecessarily suggestive nor conducive to irreparable mistaken identification *(see, People v Smith,* 38 NY2d 882; *People v Logan,* 25 NY2d 184, *cert denied* 396 US 1020; *People v Brnja,* 70 AD2d 17, *affd* 50 NY2d 366; *People v Digiosaffatte,* 63 AD2d 703). Therefore, the hearing court properly refused to suppress the out-of-court identification. Moreover, the hearing court properly found that there was an independent basis for the complainant's in-court identification of the defendant as one of the intruders based on his on-the-scene observation of the defendant's face for several seconds before fleeing for help *(see, Neil v Biggers,* 409 US 188, 199-200; *People v Burwell,* 26 NY2d 331, 336, *on remand sub nom. People v McMoore,* 37 AD2d 962; *People v Washington,* 111 AD2d 418; *People v Graham,* 67 AD2d 172).

Inasmuch as the defendant's remaining arguments are totally baseless, I vote to affirm the judgment of conviction.